**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL NO. 5:02CV116-H**

| | |
|---|---|
| **FRANCES SHROPSHIRE**, )<br>　　　Plaintiff, )<br>　　　　　　　　　　)<br>　　vs. 　　　　　　　　)<br>　　　　　　　　　　)<br>**JO ANNE B. BARNHART**, )<br>**Commissioner of Social** )<br>**Security Administration**, )<br>　　　Defendant. 　　　 )<br>　　　　　　　　　　) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Judgment on the Pleadings" (document #17) and "Brief in Support ..." (document #18), both filed August 8, 2006; and Defendant's "Motion For Summary Judgment" (document #21) and "Memorandum in Support of the Commissioner's Decision" (document #22), both filed October 6, 2006. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Judgment on the Pleadings; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

**I. PROCEDURAL HISTORY**

On January 31, 2000, Plaintiff filed an application for a period of disability and Social Security disability benefits ("DIB"), alleging that she became unable to work on December 31,

1993,[1] due to knee, back, hand, and mouth pain, bronchitis, sinus infections, high blood pressure, difficulty sleeping, difficulty concentrating and remembering, and depression. The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on February 22, 2001. On June 21, 2001, the ALJ issued a decision denying the Plaintiff's claim. The Appeals Council denied Plaintiff's Request for Review on August 2, 2002.

On September 23, 2002, Plaintiff filed this action.

On February 18, 2003, because neither the administrative claim file nor the tape recording of the first oral hearing could be located, the case was remanded for re-hearing. See "Consent Order of Remand" (document #9).

A second hearing was held on April 13, 2004, and on September 22, 2004, the ALJ again issued a decision denying the Plaintiff's claim because she did not suffer a "severe impairment" as that term is defined for Social Security purposes. The Plaintiff timely requested review by he Appeals Council, which on January 21, 2006 affirmed the ALJ's decision.

The parties' cross-dispositive motions are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Relevant to the present appeal, at the second hearing, the Plaintiff testified that she was 50 years-old on her alleged onset date (December 31, 1993) and 54 years-old on her date last insured (June 30, 1998); that she had past relevant work experience as a supervisor/manager for a linen

---

[1] In order to qualify for Social Security Disability Insurance benefits, an individual must become disabled during the period under which she is insured by the program. 20 C.F.R. § 404.131 (2006). In the present case, Plaintiff had to establish that she was disabled prior to June 30, 1998 (Tr. 23).

service; that she had last worked on December 31, 1998; and that she was then (at the time of the second hearing) unable to perform any household chores.

The Plaintiff's husband, James Shropshire, testified he had become disabled sometime in 1993 or 1994, and that afterwards, the Plaintiff had performed all household chores until sometime in 1999.

On May 30, 2000, Elizabeth Hoyt, M.D., a medical expert for North Carolina Disability Determination Services ("NCDDS"), reviewed the Plaintiff's medical records; noted that in August 1999, the Plaintiff had told one of her doctors that she was walking 3 miles daily for exercise and that the Plaintiff's most recent physical examination showed full range of motion in all joints except her left knee and normal strength throughout her body; and concluded that although the Plaintiff would have then (in 2000) been limited to medium work due to subjective complaints of pain, there was no evidence in the medical record to support "any work related limitations prior to [June 30, 1998]." (Tr. 261.)

On June 29, 2005, Frank L. Virgili, M.D., also a NCDDS medical expert, reviewed the Plaintiff's medical records and affirmed Dr. Hoyt's earlier assessment that the Plaintiff had not suffered any work-related limitations prior to her date last insured.

The Court has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation of those records is both thorough and accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> The medical evidence shows that in December 1990, the claimant told her primary care physician, Dr. Whitlock, that she had had arthritis in her left knee for about a week; she had never before had similar symptoms. She went to Dr. Waller, an orthopedist, in February 1991, and in March 1991 she underwent arthroscopic surgery on the knee. By May 1991 she had recovered from the surgery and was

3

released to return as needed. She did not return until August 1995, when she complained of pain in her right knee; Dr. Waller prescribed Relafen, an antiinflammatory arthritis medicine, and she returned 3 weeks later saying she was much improved. Dr. Waller reduced the Relafen, and the claimant failed to keep her next appointment. (Ex. 1F)

Dr. Whitlock's records show that the claimant told him in October 1992 that her left knee was still hurting; although the claimant told him in November 1992 that her musculoskeletal problems had not improved (Ex. 16F/14), Dr. Whitlock did not enter any examination findings in his record and did not prescribe Relafen or any other medicine for arthritis. The claimant did not ask Dr. Whitlock or Dr. Placentra for medication on the subsequent telephone calls for other medications and her visits to their offices between November 1992 and December 1993 or, for that matter, from 1995 to June 1998. (Exs. 3F/I6-22, 16F/1-13) There is a mention of her being on Relafen at one point in 1995 for an unspecified reason (Ex. 16F/5) but lists of current medications in 1997 included no anti-inflammatory or analgesic. (Ex. 15F)

In February 2000, less than 2 weeks after she filed her Social Security disability claim, the claimant told Dr. Placentra her leg was hurting and she was depressed by her chronic pain and disability of her knee. (Ex. 3F/3) However, only 6 months earlier, she had told Dr. Placentra that she was feeling fine and was walking 3 miles a day. (Ex. 3F/4) During the intervening 6 months, she had not gone to any doctor about the return of her knee pain; she alleges that she did not see a doctor because she had no insurance, but the record shows that she was quite able to call Dr. Placentra and request medication if necessary. She did not call and ask about the Relafen which had helped in the past when her knee hurt, nor did she inquire about the possibility of an alternative, less expensive, generic arthritis medication. The correlation between the claimant's renewed complaints to Dr. Placentra and the filing of her disability claim and the claimant's lack of perceived need for prescribed medication of the sort which had been helpful before support the finding below that the claimant's complaints of limitations in functioning, pain, and other symptoms from December 1993 to June 1998 are not credible.

Other evidence from 2000 indicates that the claimant was not telling the truth when she told SSA that she was in constant pain and was incapacitated by knee pain (Ex. IE), when she told Dr. Placentra that her knee hurt in February 2000, and when she saw Dr. Cline for a consultative disability examination in April 2000 and complained of knee trouble. In April 2000 she was still taking no medication for pain, even though she complained of pain in both knees, both hands, and her back. (Ex. 4F/5). She had received samples of medication from doctors in the past (Ex, 3F/4) but had not asked any of her doctors for samples of arthritis medication. On Dr. Cline's examination, she had normal range of motion of both knees. (Ex. 4F/11) The only abnormality on the clinical examination was a slight limp, which is a sign completely within the

patient's control and therefore entitled to evidentiary weight only to the degree the individual is found credible. The claimant did not have the tenderness which Dr. Waller had found before her surgery (Ex. 1F/4), much less the tenderness, warmth, and swelling Dr Whitlock had found (Ex. 16F/17). (Ex. 4F/8) X-rays of the knees were negative. (Ex. 4F/2,3)

Dr. Cline wrote in April 2000 that the claimant had chronic arthritis in her left knee which was probably permanent, with chronic knee symptoms which limited her mobility and endurance. (Ex. 4F/9) However, Dr. Cline's clinical findings had been entirely normal (apart from the slight limp) and he had not yet seen the x-rays which established that the claimant in fact did not have arthritis in either knee. (He filled out and signed his report on April 25, while the x-ray results were not released until April 26.) Negative x-rays do not rule out problems in the soft tissues in and around the knee, but Dr. Cline did not diagnose such problems. The undersigned gives no credit to Dr. Cline's diagnosis of arthritis in the knee or his opinion that knee arthritis limited the claimant's mobility and endurance.

Dr. Henry, a retired professor of medicine who lives in Florida part of the year and in North Carolina the rest of the time, wrote in a "To whom it may concern" letter elicited by [Plaintiff] in February 2001 that the claimant had been "known to him" since 1994 and that he had treated her since about 1996. He writes that in (possibly) August 1995, the claimant had developed symptomatic osteoarthritis of both knees. (Ex. 9F) This statement adds nothing to Dr. Waller's records, which show that the claimant complained of right knee pain (not left knee problems), and Dr, Cline's x-rays in 2000 showed that she did not have osteoarthritis (degenerative bony changes). In fact, the only independent evidence that Dr. Henry had ever treated the claimant was the mention of a prescription in 1995 for Relafen from him. (Ex. 16F/5) The claimant testified in 2001 that she still saw him when he was in North Carolina (Ex. 14B/22), but her reports of her medical treatment during the relevant period do not mention Dr. Henry. (Ex. 1E/4-7,11-12, 4E/10-I3) One assumes that if the claimant was still seeing Dr. Henry in 2000 as she testified in 2001, [Plaintiff] would have sought any records covering the period from December 31, 1993, through June 30, 1998.

[Plaintiff] obtained another "To whom it may concern" letter from Dr. Whitlock after the prior hearing in May 2001, for purposes of supporting the recent request for Appeals Council review. Dr. Whitlock writes that since 1993 or 1994, he had thought that the claimant would be able to return to work but "it is looking less and less likely as time goes by. She has been trouble by a series of complications with osteoarthritis ... She developed osteoarthritic complications in her left knee requiring surgical intervention. She has now developed osteoarthritis in... her right knee." (Ex. AC-1)

The record summarized above shows that once the claimant's left knee healed after arthroscopic surgery in 1991, her left knee caused her no more problems until she filed

5

her disability claim in 2000, and she did not even need any arthritis medications of the sort taken by numerous individuals in the work force to relieve aches and pains....

X-rays done for Dr. Cline in 2000 did show "a little" degenerative arthritis (osteoarthritis) in the joint at the base of each thumb (Ex. 4F/1,2), but there was no tenderness or limitation of motion of the thumbs. Despite her allegation to Dr. Cline that she had trouble grasping objects and that sometimes she cannot hold *anything,* he found that she could handle small objects without difficulty and her grip strength was commensurate with her overall muscle strength. (Ex. 4F/5,7,8,10) She reports a history of left carpal tunnel surgery and Dr. Cline found a scar on her left hand. (Ex. 4F/7,8) According to Ex. 10F/1, her left carpal tunnel release (CTR) was done in 1989 (see also Ex. 16F/20), and there is no evidence that she returned to Cape Fear Orthopedic for hand problems after that. She saw another orthopedist, Dr. Waller, from 1991 to 1995 and never complained of recurrent hand problems. (Ex. IF) She was under the care of Dr. Placentra until 2000 and Dr. Whitlock until 1997, and their records show no complaints of hand pain or, as noted above, requests for anti-inflammatory analgesics.

There is no x-ray evidence or clinical finding establishing that the claimant had any medically determinable abnormality in her hands from December 31, 1993, through June 30, 1998, much less one that could be expected to cause symptoms. The x-ray findings in 2000 of "a little" joint space narrowing in the joints at the base of her thumbs obviously did not appear overnight, but the undersigned does not believe that this minimal finding can be carried back 2 years.

The claimant had a history of left carpal tunnel surgery in 1989, and this history could be considered a "medically determinable abnormality", but she returned to work at a job requiring a good deal of handling and fingering without any complaint to any physician of any pain, numbness, tingling, or any other symptom of thumb arthritis or recurrent carpal tunnel symptoms. Again, she had insurance in 1993 and one would think that if her hands were bothering her at work, she would have asked for an evaluation or pain medication in hopes of being able to continue. She did not do so, not even when she was seeing an orthopedist, Dr. Waller, in 1991 or 1995 for her knees and was allegedly having trouble using her hands. Dr. Cline's examination showed that she had no abnormality of her thumbs, hands, or wrists in terms of limitation of motion, joint tenderness or swelling, nor was there any loss of sensation as late as 2000. Dr. Henry does not mention that the claimant had any trouble with her hands (Ex. 9F), and Dr. Whitlock writes only that she "now" has arthritis in her thumbs, obviously on the basis of the April 2000 x-rays sent him by SSA after Dr. Cline's examination. (Ex. AC-1)....

The claimant told Dr. Cline in April 2000 that she had back trouble; his examination found full range of motion of the back and no tenderness or neurological abnormality, but her lumbosacral x-ray showed considerable degenerative disc disease and

sclerotic changes at L5-S1. This is a condition which, in some individuals and at some times, could reasonably be expected to cause back pain. However, it is less clear that such a finding could reasonably have been expected to cause back pain 2 years earlier, at the claimant's date last insured. The medical evidence shows no complaint of chronic or acute back trouble to any treating physician, except for a visit to the ER in January 1989, when the claimant had fallen and hurt her coccyx. There is no evidence of a fracture of the coccyx at that time or of any complaints after that. The 2001 letters of Drs. Whitlock and Henry do not mention a history of back pain. The claimant testified in 2001 that her back bothered her severely from time to time, sometimes so bad she could hardly stand it, and that it had done so since she fell and hurt her tailbone in 1989. (Ex. 14B/19) This suggests that the alleged back pain is in the area she hurt when she fell in 1989, but the tailbone (coccyx) is not very near the site of the documented degenerative disease at L5-S1....

She told Dr. Cline in April 2000 that she had bronchitis about every 3 months. (Ex. 4F/6) At the hearing in 2001 (Ex. 14B/8,15,16) and in Ex. IE/9, she alleged that she had had such bad bronchitis in 1996 that she had had to take antibiotics all year; at the time she had had such bad laryngitis that she could not speak at all for weeks at a time.

The medical evidence shows that the claimant saw a doctor or telephoned for medication for respiratory problems or ear trouble in December 1989, April and December 1900, September 1991, December 1992, December 1993, August and October 1994, and December 1996. (Ex. 16F) Dr. Whitlock heard some wheezes during the episode of bronchitis in 1989 (Ex. 16F/19), but there has been no other evidence of bronchospasm. The undersigned has carefully examined the records of Dr. Whitlock and Dr. Placentra from 1994 to 1998 (in case the claimant got the year wrong, as she had done Ex. IE/9) and can find nothing that supports her allegation of taking antibiotics for a year or of episodic laryngitis lasting for weeks at a time. The only possible explanations are that the claimant's recall since 2000 concerning her medical problems in 1993-1998 has been faulty, or that she somehow got "carried away" during her 2001 testimony (though this does not explain Ex. IE/9), or that she was intentionally exaggerating her condition in her 2001 testimony to make herself appear more disabled during the period in question than she knows she was. Whatever the explanation, the undersigned is of the opinion that little weight can be given the claimant's written and sworn statements about her condition in 1993-1998 since she filed her claim in 2000.

The record does not indicate that from December 31, 1993, through June 30, 1998, the claimant had any trouble with bronchitis or sinusitis or any problem with the respiratory tract or inner ear between the episodes listed above, or that any episode lasted for more than a very short period. It is not a medically determinable abnormality to get a cold or even bronchitis once or even twice a year, and the record does not show that the claimant had any kind of episode of infection of such

frequency, duration, or severity as to impose any identifiable functional limitations whatsoever for more than a few days at most. There is no evidence of chronic pulmonary disease; as late as 1999, the claimant was walking 3 miles a day without any problem....

The record shows that the claimant had normal blood pressures until 1992, when she had blood pressures of 140/90 and 150/100 and was prescribed medication. Her blood pressures were controlled until late 1993, when she apparently had run out of her medication; they remained good for a while after that but from late 1994 to June 1998, her blood pressures were sometimes good but often bad. (Exs. 16F, 1 IF, 15F, 3F, 4F) A medication tried in 1994 helped but was too expensive; 2 or 3 others gave her palpitations on and off in 1995-1997, and a third was suspected of causing oral candidiasis or thrush in 1997. She was put on Diovan in May 1997 and has continued to take it to the present, indicating that she and her doctors find it satisfactory. When she changed to Dr. Placentra's care in November 1997, it was noted that she was having palpitations and hot flashes, but there is no mention of any treatment prescribed, apart from checking her thyroid levels. In March 1998, Dr. Placentra wrote that her blood pressure had been going up as she gained weight, even though she was dieting, with the systolic readings running in the high 130s and the diastolics in the high 80s. Dr. Placentra prescribed a diuretic in case the claimant was retaining water. (Ex. 3F/20,22) The claimant continued on Diovan and HCTZ through the end of the period covered by this decision; the claimant told Dr Placentra in June 1999 that her blood pressure was under control and, of course, she was walking 3 miles a day in August 1999 on the same medication....

The claimant's eyes showed no sign of hypertensive changes when she was examined by Dr. Whitlock in 1993 and Dr. Cline in 2000 (Exs. I6F/12, 4F/8); she told Dr. Cline that she had headaches due to vision problems, but the only evidence of vision problems is a mention of a vitreous humor detachment in December 1998, after her date last insured (Ex.6F). Dr. Whitlock checked her blood work for kidney problems in 1993 and found none. (Ex. 16F/12) There is no evidence of any heart damage; her intermittent episodes of palpitations are described as caused by her medication and stopped when her medication changed. There is no evidence that the claimant had anything wrong with her heart in 1993-1998, much less any damage from hypertension. None of her doctors has stated that she had hypertensive cardiovascular, eye, kidney, or cerebrovascular disease....

The undersigned must also consider the side effects of the claimant's medication. In December 1994, the claimant was prescribed Tenormin (atenolol) for her hypertension and told her doctor in January 1995 that it caused irregular heart beats. Dr. Whitlock did not feel that this warranted investigation. Tenormin controlled her blood pressure and she continued to take it without any further complaint until June 1995, when she again reported irregular heart beats; nonetheless, Dr. Whitlock kept her on the medication

and in October 1995 she said her heart had "calmed down"; she continued to take Tenormin until October 1996, when she said her palpitations were worse and she was changed to Toprol. (Ex. 16F/4-7) The claimant testified in 2001 that her palpitations made her feel very weak and gave her terrible headaches (Ex. 14B/18), but the record does not show that she told Dr. Whitlock this at the time....

Dr. Henry writes in February 2001 that the claimant "developed severe arrhythmia" in January 1995 which required some unspecified "lifestyle changes" and medication to control. It may be that the claimant had severe arrhythmia and required a cardiac anti-arrhythmiac medication, but if so there is no confirmation in the records now in the file of either the condition or the medication....

The claimant has seen numerous doctors on numerous occasions from April 1997 to June 1998 and none has observed that he had any difficulty conversing with the claimant. (Exs. 16F/1-3, She did not require treatment for candidiasis when she saw a dermatologist for unrelated problems from September 1997 to September 1999. No candidiasis lesions were noted when she had full-body dermatological examinations in September 1997 and February 1998, and when she complained of a rash on her face in February 1998, the dermatologist diagnosed mild xerosis (dry skin). (Ex. 2F) Dr. Cline noted no abnormality of the face in April 2000 (Ex. 4F/8).

Dr. Henry states that the claimant developed a severe Candida yeast infection of the lips and mouth in February 1997 for which she was still taking expensive medication in February 2001. (Ex. 9F) Not only is there no mention of any medication for a yeast infection in 2000-2001 (Exs. 4E, 4F/5), there is no evidence that she continued to take the prescribed medication after 1997. (See Ex. 6E, prescription information submitted at the 2001 hearing.) She saw Dr. Whitlock and Dr. Placentra numerous times after June 1997 and did not mention her yeast infection to them on any visit....

The relevant medical evidence shows that the claimant complained to Dr. Whitlock that when she was off Premarin for a "medication vacation" for 2 days a month, she was more depressed. This did not require treatment. (Ex. 16F/14) When she told Dr. Whitlock in October 1996 that her palpitations were worse, Dr. Whitlock wrote that stress possibly contributed to the symptoms; he did not prescribe anything for anxiety or depression, (Ex. 16F/4) In February 2000, the visit 2 weeks after the claimant filed her disability claim. Dr. Placentra wrote that the claimant was depressed over her chronic pain from arthritis and prescribed Paxil for situational depression. (Ex. 3F/2) On the other hand, when she saw Dr. Cline 2 months later, she did not complain of feeling depressed and was not taking Paxil. Dr. Cline did not think she looked depressed or anxious. (Ex. 4F) The medical records show no antidepressant or anti-anxiety medication being taken during the period covered by this decision, no treatment by any treating physician, and no recommendation that she seek counseling or other assistance.

(Tr. 4-13.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evi-

dence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes before the expiration of her insured status on June 28, 1999.[2] It is not enough for a claimant to show that she suffered from severe medical conditions or impairments which later became disabling; rather, the subject medical conditions must have become disabling prior to the date last insured. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971) (no "manifest error in the record of the prior administrative proceedings" where Plaintiff's conditions did not become disabling until after the expiration of his insured status).

The ALJ considered the above-recited evidence and found after the second hearing that

---

[2] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that between December 1993 and June 30, 1998, Plaintiff's history of left knee surgery, left carpal tunnel release without residuals or new symptoms, some unknown asymptomatic degree of one-level lumbosacral degenerative disc disease and arthritis, asymptomatic hypertension without end-organ damage, some symptoms of medication-related palpitations, and a yeast infection on her lower face and oral/nasal cavities were "medically-determinable" impairments; but that at no time prior to June 30, 1998, were they "severe impairments" within the meaning of the Regulations; that the Plaintiff had not established the existence of any other severe impairments within the required period; and that, therefore, she was not disabled.

The Plaintiff contends that the ALJ erred in concluding that her medically-determinable hand, knee, and back pain, bronchitis, hypertension, and/or skin maladies did not amount to "severe impairments" prior to her date last insured. See Plaintiff's "Motion for Judgment on the Pleadings" (document #17) and "Brief in Support ..." (document #18). The undersigned finds, however, that there is substantial evidence supporting the ALJ's conclusions concerning those alleged impairments, and his ultimate determination that the Plaintiff was not disabled.

The "severity regulation," 20 C.F.R. §404.1520, is applied to screen out de minimus claims. Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). An impairment will be considered non-severe if it is only a slight abnormality that would have such a minimal effect on an individual that it would not be expected to interfere with the individual's ability to work. Albright v. Commissioner of The Social Security Administration, 174 F.3d 473, 474 n.1 (4th Cir. 1999), citing Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). Additionally, the Plaintiff bears the burden of proving that her alleged leg impairment is severe enough to significantly limit her ability to perform substantial gainful

activity and that it is of disabling severity for 12 months. Barnhart v. Walton, 535 U.S. 212, 218-219 (2002). A physical impairment is considered non-severe when it does not significantly limit a person's ability to perform the basic physical functions of work, such as walking, standing, sitting, lifting, reaching, pushing, pulling, carrying, handling, seeing, hearing or speaking. 20 C.F.R. §404.1521.

As part of her challenge to the ALJ's severity determination, the Plaintiff assigns error to the his conclusion that Dr. Whitlock's "opinion" was not entitled to controlling weight. As noted above, on May 2, 2001, Dr. Whitlock wrote in a "to whom it may concern" letter that he had been Plaintiff's primary care physician for a decade or more; that for the preceding seven or eight years he had believed that she would be able to return to gainful employment, but that was "looking less likely as time goes by"; and that Plaintiff had been "troubled by a series of complications with osteoarthritis and hypertension and the complications of effective antihypertensive therapy." To the extent that this letter even amounted to an opinion that the Plaintiff suffered "severe" impairments or was "disabled" for Social Security purposes on or before June 30, 1998, the ALJ's conclusion that such an opinion was not entitled to controlling weight was supported by substantial evidence.

The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76

F.3d 585, 590 (4th Cir. 1996).

The ALJ concluded that Dr. Whitlock's opinion was contradicted by his and other treating physician's records, discussed above and below. Plaintiff's knee pain resolved after her 1991 arthroscopy, allowing her to return to her linen service job that required her to stand for at least three hours. The Plaintiff did not request any medication for arthritis prior to June 30, 1998, and as previously noted, in August 1999, informed Dr. Placentra that she was walking three miles a day for exercise.

The ALJ also noted that although the Plaintiff returned to Dr. Waller in August 1995 complaining of knee pain, within three weeks of that visit, she reported that her condition was much improved. In addition, as the ALJ further noted, the Plaintiff failed to keep her follow up appointment with Dr. Waller and there was no mention of any further treatment for this condition until February 2000. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The Plaintiff's subjective complaints of knee pain in 2000 were also inconsistent with Dr. Cline's finding that her knee range of motion was normal and her negative X-ray results.

Accordingly, the ALJ properly concluded that Plaintiff had no medically determinable impairments of her right knee and, while she had a medically determinable abnormality of the left knee, that she had returned to full functioning (with respect to standing, walking, kneeling, crouching and crawling) in that knee prior to her alleged onset date, and thus, that her left knee condition was not a

severe impairment within the meaning of the Act.

The ALJ properly addressed whether Plaintiff's hand pain was a severe impairment, noting that in 2000 Dr. Cline had concluded that she had no tenderness or limitation of motion in her thumbs, that she could handle small objects without difficulty, that her grip strength was commensurate to her overall muscle strength (although contemporaneous X-rays revealed slight degenerative arthritis in the base of both thumbs). The ALJ also noted that while Plaintiff reported a history of left carpal tunnel release surgery, the release was performed in 1989 and there was no evidence that she sought further treatment for the condition. The Plaintiff never complained of hand pain to either Dr. Whitlock, Dr. Waller or Dr. Placentra, and she never requested any anti-inflammatory analgesic for symptoms of her hand condition. Therefore, the ALJ reasonably concluded that although the Plaintiff had successful left carpal tunnel release surgery in 1989, she had no symptoms or signs of a new or recurrent abnormality which caused any functional limitation, and thus, did not have a severe hand impairment prior to her date last insured.

Concerning the Plaintiff's back pain, the medical record reveals that she had not complained of chronic or acute back pain to any of her physicians, except during an emergency room visit in 1989 after she had fallen and hurt her coccyx. Although the Plaintiff complained of back problems during her 2000 consultative examination with Dr. Cline, he observed that she had full range of motion in her back with no tenderness or other neurological abnormalities. The ALJ, giving the Plaintiff every benefit of the doubt, ultimately determined that although it was reasonable to infer that she had some degree of lumbosacral disc disease and arthritis in June 1998, because the record demonstrated that her condition did not cause her any limitations and that she was largely if not entirely asymptomatic, her back impairment was not severe during the relevant period.

The ALJ addressed Plaintiff's alleged respiratory impairments, correctly noting that although the medical records showed that the Plaintiff had suffered intermittent bronchitis or sinus infections in 1989-90, 1991-93, and 1996, it was undisputed that whenever Plaintiff had a respiratory episode, it responded to treatment, was of a short duration, and caused no longer term functional limitations. Accordingly, the ALJ concluded that Plaintiff did not have a severe respiratory impairment prior to June 30, 1998.

The ALJ also properly evaluated the evidence to determine whether Plaintiff's hypertension was a severe impairment, noting that the Plaintiff had no problem with hypertension until 1992, at which point she was initially prescribed medication which controlled the condition until late 1994. Although the Plaintiff was thereafter placed on several different blood pressure medications as Dr. Placentra sought the most effective treatment, by 1997, the condition was again controlled. On June 2, 1999, nearly a year after her date last insured, the Plaintiff reported to Dr. Placentra that her home monitoring of her blood pressure showed that it was controlled. For these reasons, and because none of her doctors ever placed restrictions on her activities because of her blood pressure, the ALJ found that it was not a severe impairment prior to June 30, 1998.

Finally, concerning the Plaintiff's skin ailments, the Plaintiff was seen by numerous physicians in 1997 and 1998 for her oral thrush, none of whom ever observed that she had difficulty speaking. The Plaintiff's candidiasis was treated by her dermatologist between September 1997 and September 1999, but there were no lesions observed at her dermatological examination in February 1998, and Dr. Cline noted no abnormality on her face in April 2000. Nor was there any indication in the record that either of these conditions limited the Plaintiff's ability to be around people or otherwise required substantial restrictions in her daily living, including her eating, speaking or breathing. Accordingly,

the ALJ properly concluded that while the skin conditions were medically determinable impairments, they caused no functional limitations and therefore were not severe impairments.

The record is also clear that the Plaintiff engaged in significant daily life activities during <u>and after</u> the relevant time period, such as bathing and dressing herself, performing household chores, and walking three miles daily for exercise. On the relevance of an ability to engage in substantial daily activities to a disability claim, <u>see, e.g.</u>, <u>Mickles</u>, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); <u>and Gross</u>, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for evaluating a claimant's subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was <u>not</u> fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996), <u>citing</u> 20 C.F.R. § 416.929(b); <u>and</u> § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." <u>Id.</u> at 595, <u>citing</u> 20 C.F.R. § 416.929(c)(1); <u>and</u> § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint

17

> motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record clearly contains evidence of Plaintiff's hand, knee, and back pain, bronchitis, hypertension, and skin maladies, and thus the ALJ correctly concluded that the Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of her pain, and the extent to which it affects her ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, that is, to exercise and do housework, as well as the objective medical record discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations concerning the severity of the Plaintiff's impairments and, ultimately, that she was not disabled.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion for Judgment on the Pleadings" (document #17) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #21) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: October 11, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge